336 A.2d 328

Fred SCHUBACH and Florence Schubach,
Appellees,

Raymond Hrubovak et al., Appellees,

Alexander G. Allison and Dorothy Allison

v.

David SILVER et al., Appellants,
and
City of Philadelphia and Girard Trust Bank,
Intervenor-Defendant, Appellant (two cases).

Supreme Court of Pennsylvania.

Argued Jan. 21, 1974.

Decided March 18, 1975.

368

Irvin Stander, Philadelphia, for David Silver and Pine Hill Home, Inc.

Henry W. Sawyer, III, David W. Maxey, Ward T. Williams, Drinker, Biddle & Reath, Philadelphia, for Girard Trust Bank.

J. Leon Rabben, Philadelphia, for appellees, Fred Schubach, Florence Schubach, Dr. Leon S. Caplan and Rosemarie E. Caplan.

R. L. Bazelon, Philadelphia, amicus curiae.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

Once again this Court is faced with the legal issues surrounding the controversy which has arisen over the construction of the Pine Hill Home, a nursing home facility for multiple handicapped children, in the northeast section of the City of Philadelphia. Instantly, we are faced with the question of whether a rezoning of the area upon which the Home is constructed was unconstitutional as spot zoning. To facilitate an understanding of the complex legal issues and their resolution, we will undertake a complete procedural and factual background of the controversy.

## PROCEDURAL BACKGROUND

In 1966, Pine Hill Home, Inc., [appellant instantly] purchased a two-acre tract of land in Northeast Philadelphia. At the time of purchase the land was zoned R–4

[residential].[1] In 1966, Pine Hill filed an application with the Philadelphia Zoning Board for a special certificate to allow the construction of the Home. The Application was refused by the Zoning Board, and the Court of Common Pleas affirmed the denial on appeal. In 1967, Pine Hill made an effort to have the land rezoned from an R–4 to C–2, a commercial classification, under which the Home could be built without a special certificate. City Council, however refused to pass the rezoning measure. In 1968, Pine Hill once again requested City Council to rezone the land from R–4 to C–2, and this time the Ordinance (No. 36) providing for the rezoning successfully passed City Council.[2]

Fred Schubach and a group of neighborhood residents [appellees instantly] appealed the enactment of Ordinance 36 to the Zoning Board of Adjustment alleging the Ordinance constituted spot zoning and was, therefore, unconstitutional. After a hearing, the Zoning Board dismissed the appeal. Thereafter, an appeal was immediately taken to the Court of Common Pleas which sustained the action of the Zoning Board.[3]

From the judgment of the Court of Common Pleas an appeal was taken to this Court, and on October 9, 1970, this Court in an opinion by Mr. Justice Jones [now Mr. Chief Justice] reversed the lower court and declared Ordinance 36 to be a "classic" case of spot zoning. *Schu-*

1. A nursing home may be erected in an R–4 area, provided a special certificate is granted by the Zoning Board of Adjustment. The Philadelphia Code, Zoning and Planning, §§ 14–203(2)(f) and (h).

2. At the insistence of City Council President, Paul D'Ortona, Pine Hill's attorney agreed to a restrictive covenant limiting the use of the land to a nursing home, thereby excluding all other C–2 permissible uses. On May 6, 1968, the restrictive covenant was executed.

3. Following the action of the Zoning Board, Schubach petitioned the lower court for a restraining order to enjoin the construction of the Home. The petition was denied and construction commenced under building permits issued by the city.

*bach v. Zoning Board of Adjustment*, 440 Pa. 249, 270 A.2d 397 (1970) [hereinafter *Schubach I*]. Notwithstanding the decision of this Court the city of Philadelphia failed to revoke the outstanding building permits and Pine Hill continued construction of the Home.[4]

The failure of Pine Hill to cease construction after the decision of this Court in *Schubach I* precipitated the initiation of the instant action. On December 8, 1970, Schubach filed an action in equity in the Court of Common Pleas seeking to enforce this Court's decision and enjoin further construction of the Home, have the building permits revoked, the structure as it then existed demolished, and the award of money damages to the individual appellees. Schubach thereafter, on January 12, 1971, petitioned this Court for a directive order to the lower court to enforce the ruling in *Schubach I*. Upon receiving notice of the petition filed in this Court, the city revoked the outstanding building permits.

Before this Court took action on the petition for the directive order, City Council of Philadelphia passed Ordinance No. 2139 which rezoned the Pine Hill land and some adjoining property from R–4 to C–2 and on January 27, 1971, the city reinstated the building permits for the Home.[5]

On January 29, 1971, this Court, through Mr. Chief Justice Jones, issued an order enjoining the further construction and operation of the Home pending the outcome of the equity action. The city thereafter revoked all outstanding permits.

4. The continuation of construction was in direct contravention of the decision of this Court, since we had declared Ordinance 36 invalid. After we declared Ordinance 36 invalid the land reverted to a R–4 zoning classification.

5. An immediate appeal was taken to the Zoning Board challenging Ordinance 2139. However, the Zoning Board stayed all proceedings before it pending a resolution of the equity action.

In the equity action, the appellants [6] were allowed to file Supplemental New Matter to their pleadings asserting the validity of the new zoning measure, Ordinance 2139. Appellees' basis for relief in the lower court was: the Home was constructed contrary to *Schubach I; Schubach I* was res judicata; the Home constituted a private nuisance; and, Ordinance 2139 was unconstitutional as spot zoning.

Following an extensive hearing before Judge Sporkin, sitting as a chancellor, a decree nisi and opinion was filed denying all of appellees' contentions. Specifically, Judge Sporkin found that: (1) a court sitting in equity had jurisdiction to consider the instant matter; (2) that Ordinance 2139 was constitutional and did not constitute spot zoning; (3) the Home did not constitute a private nuisance; (4) *Schubach I* was not res judicata; (5) that appellees were not entitled to private damages; and continuation of construction after this Court's decision in *Schubach I* was contrary to that decision. Exceptions were filed and a court sitting en banc filed a supplemental opinion dismissing the exceptions and making the decree nisi final, but a fine in the amount of $4200 was assessed against Pine Hill to be paid to the city for violation of the Philadelphia Zoning Code.

An appeal was taken to this Court, however, we transferred the appeal to the Commonwealth Court. 448 Pa. 421, 293 A.2d 884 (1972).[7] The Commonwealth Court [opinion, Judge Blatt] unanimously concluded Ordinance

6. Girard Trust Bank was allowed to intervene below because of its financial interest in the construction of the Home. Girard had loaned approximately $1,700,000 to finance the construction. Girard is an appellant in this Court presently in a related action.

7. This Court retained jurisdiction to impose sanctions for violation of our order of January 29, 1971, and to rule on a petition for modification of that order.

Subsequently, in a per curiam opinion, this Court imposed sanctions upon appellant and dismissed the petition for modification. *Schubach v. Zoning Board of Adjustment*, —— Pa. ——, 308 A.2d 595 (1973).

2139 constituted spot zoning, and, hence, was invalid. The Commonwealth Court also concluded "that certain of the determinations" made by this Court in *Schubach I* were conclusive and could not now be re-examined because of collateral estoppel. The Commonwealth Court, therefore, reversed the decree of the Court of Common Pleas. We granted allocatur.

## FACTUAL BACKGROUND

The facts surrounding the controversy are as follows.

The land rezoned by Ordinance 2139 [hereinafter Tract] is approximately four acres in size and is located in Northeast Philadelphia. The rezoned Tract consists of, in addition to the Pine Hill land, five contiguous parcels of land in separate ownership. The land in question makes up approximately one-half of a city block, which is bordered by Red Lion Road, Verree Road, Chesworth Road and Ferndale Street, with the Tract fronting on Red Lion Road and Verree Road. Looking at the surrounding area in a clockwise fashion to the north of the Home, there is a 450-acre plot of land zoned industrial. To the east and directly across Red Lion Road is an area zoned commercial, where a gas station and commercial stores are presently located. To the southeast and south, there is a medical center, apartment buildings and a shopping center. To the west, the surrounding land is almost exclusively residential. And lastly, to the northwest there is an apartment structure.[8]

## LEGAL ISSUES

Turning to the legal issues presently involved, we must primarily focus our attention on the question of

8. It is clear from the record that the complexion of the neighborhood has changed substantially since this Court's decision in *Schubach I.*

whether Ordinance 2139 is spot zoning.[9] However, before we can directly confront this issue, we must first determine the question of whether this Court's decision in *Schubach I* acts as res judicata or collateral estoppel in the instant case on any of the issues.

Initially, appellees argue that *Schubach I* operates as res judicata in the instant case. Both the chancellor and the Commonwealth Court refused to accept this position, and in this regard we rule both courts were correct.

[■] In order to successfully assert the doctrine of res judicata, there must be a concurrence of four elements. These elements were set forth in the Fisher Building Permit Case, 355 Pa. 364, 49 A.2d 626 (1946), wherein the Court stated:

"In the case of *Siegfried v. Boyd*, 237 Pa. 55, 59, 85 A. 72, 73, we said: 'In order to make a matter res adjudicata there must be a concurrence of the four following conditions: (1) identity in the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; (4) identity of the quality in the persons for or against whom the claim is made.'" *Id.* 355 Pa. at 367, 49 A.2d at 627.

■■ Both courts below determined that because the size of the Tract had substantially increased (one and one-half acres) over the size of the plot of land involved in *Schubach I*, there was no identity in element two, i. e., the cause of action. This was correct. In *Filanowski v. Zoning Board of Adjustment*, 439 Pa. 360, 266 A.2d 670 (1970), this Court aptly pointed out:

"[I]f this argument of the appellants were construed as advancing a plea of 'res judicata' it is still without

**9.** Appellees argued three other issues before the trial court and the Commonwealth Court. They were: (1) a court of equity does not have jurisdiction to consider a zoning matter; (2) the Home constitutes a nuisance per se; and (3) the individual appellees should be awarded damages. Both lower tribunals resolved these issues against appellees. We have independently reviewed each issue and rule the courts below were correct in the disposition of these questions.

merit. An order of a court affirming a decision by a Zoning Board refusing a variance does not preclude a subsequent grant of a variance for the same land if there has been a subsequent substantial change in conditions incident to the land itself. *J. B. Simon & Co. v. Zoning Board of Adjustment,* 403 Pa. 176, 168 A.2d 317 (1961) ; *In re Crawford Zoning Case,* 358 Pa. 636, 57 A.2d 862 (1948)."

Id. 439 Pa. 360 at 363, 266 A.2d at 672. Moreover, in this regard we take specific notice of the fact that the legal commentators in the zoning field have expressed the view that res judicata should be applied sparingly in the area of zoning. Ryan, in his work, Pennsylvania Zoning Law and Practice, § 9.4.17, page 67 (1970), makes this point in the following manner:

"With the exception of issues which turn on the legality of specific events, the doctrine of res judicata has not taken much of a hold on zoning. This is sound, for zoning is a continuing regulation and flexibility in zoning matters outweighs the risk of repetitive litigation."

See also Yokley, Zoning Law and Practice, Vol. 2, § 19–10, page 438 (3rd ed. 1965).[10] Hence, we rule the doctrine of res judicata has no application instantly.

---

**10.** See *City of Miami Beach v. Prevatt,* 97 So.2d 473 (1957): "Without entering into an extended discussion of the subject, the doctrine of res judicata or estoppel by judgment is one which should be applied in zoning cases with great caution. It is, of course, an essential element, among others, of res judicata, that there be an identity of causes of action and this means an identity of the facts essential to the maintenance of the action. The former decisions of this Court relating to the validity of the zoning ordinance with reference to the lands in the large area under discussion were necessarily based upon the facts existing at that time. In fast growing areas, such as the City of Miami Beach, changes occur with great rapidity; it cannot, therefore, be said that, even where the same parties are involved, an adjudication of the reasonableness of a zoning ordinance at any given time is necessarily res judicata or constitutes an estoppel by judgment in subsequent litigation between the same or different parties." *Id.* 97 So.2d at 477.

Turning now to the doctrine of collateral estoppel which the Commonwealth Court ruled proscribed the reconsideration of "certain of the determinations" made by this Court in *Schubach I.*

The law in Pennsylvania on collateral estoppel was set forth in *Pilgrim Food Products Company v. Filler Products, Inc.,* 393 Pa. 418, 143 A.2d 47 (1958), wherein the Court stated:

> " 'If the parties to an action have had an opportunity to appear and be heard in a prior proceeding involving the same subject matter, all issues of fact which were actually adjudicated in the former action and essential to the judgment therein are concluded as between the parties even though the causes of action in the two proceedings are not identical.' *Larsen v. Larsen,* 392 Pa. 609, 612, 141 A.2d 353, 355 (1958); *Thal v. Krawitz,* 365 Pa. 110, 112, 73 A.2d 376 (1950); *In re Wallace's Estate,* 316 Pa. 148, 153, 174 A. 397 (1934); Restatement, Judgments § 68 (1942)."

*Id.* 393 Pa. 418 at 421–22, 143 A.2d at 49. Basically, *Pilgrim* is merely a judicial translation of the Restatement, Judgments, § 68 which is the accepted law in Pennsylvania.

The Restatement sets forth the following test:
"(1) Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action . . . ."

Hence, for the doctrine of collateral estoppel to apply it must appear that the fact or facts at issue in both instances were identical; that these facts were essential to the first judgment and were actually litigated in the first cause.

■ The Commonwealth Court held these criteria were present, and applied the doctrine of collateral estoppel to the physical characteristics of the Tract and the neighborhood, stating:

> "As stated above, because of the additional property included in Ordinance 2139, the Supreme Court's decision in *Schubach I* cannot act as res judicata, but it is basically only that size differential which distinguishes *Schubach I* from this case [as to the validity of the rezoning]. The parties and the issues are essentially the same and the neighborhood has changed little, if at all, in the intervening period."

In this the Commonwealth Court was in error. A close reading of the record reveals the facts instantly and those present in *Schubach I* are not identical. By enlarging the size of the land, the Tract now fronts on two heavily traveled traffic routes, which clearly distinguish the instant Tract from the land involved in *Schubach I*. Moreover, by enlarging the Tract to include five contiguous parcels, we are no longer dealing with an "island" which is the classic example of spot zoning. Rather, we are now dealing with a piece of land which adjoins commercial property. Lastly, and contrary to the position taken by the Commonwealth Court, the complexion of the neighborhood has changed since 1970 with the addition of several structures in the nature of large apartment buildings, hospitals and shopping centers. The error of the Commonwealth Court in this respect is readily apparent when compared to the findings of the chancellor. The Commonwealth Court in this respect found:

> "We must, therefore, hold that certain of the determinations made by the Court in *Schubach I* are still conclusive as between these parties, among them being that: (1) the Pine Hill tract is in the midst of detached dwelling houses and the lot does not differ from its neighbors by either location or topography . . . ."

Whereas the chancellor described the land in the following manner:

"The writer of this Opinion made a personal inspection of the premises, the facility, and the surrounding area. He finds the structure to be attractive and esthetically conceived. Furthermore, its exterior architectural design and functional plan is not so at variance with that of the neighboring residences as to cause any significant depreciation in the values of these properties. *When one stands on the pavement facing the nursing home building, he sees just a short distance away a shopping center, a diner, and a gasoline station, all of which are certainly less pleasant to gaze upon than the building and grounds in question. Furthermore, as one walks along the northerly boundary of the Ordinance 2139 property adjacent to Red Lion Road, it is apparent that he is in the lap of a commercial district.*" [Emphasis supplied.]

The Commonwealth Court also applied the doctrine of collateral estoppel to another important issue of fact, and stated:

"[T]here is a need, *in general,* for nursing homes in Philadelphia, but there is no reason to believe that this home could not be built in a properly zoned area and there is no evidence that this nursing home would fulfill the needs of this *particular* neighborhood, . . . ." [Emphasis supplied.]

We hold this was error. For an issue of fact to be binding in a subsequent proceeding the parties must have had an opportunity to "actually litigate" the issue. A close reading of the cases on spot zoning which refer to the elements of "needs of the community" shows that *Schubach I* was the first case where this Court narrowed the definition of community to "particular community". The Court in *Schubach I* relied on *Salvitti v. Zoning Board of Adjustment,* 429 Pa. 330, 240 A.2d 534 (1968),

for this position but the Court in *Salvitti*, made no mention of the element of "particular community". In *Salvitti*, the Court simply said:

> "The zoning, mandated by the board had no substantial relation to public health, safety, morals or general welfare and was an endeavor to isolate, without reason, a 200-foot square piece of ground from surrounding residential use to a commercial use not necessary to the community."

*Id.* at 332, 240 A.2d 534, 536. It is simply impossible to say an issue was actually litigated in a prior proceeding when the elements of the issue are varied by a case announced by a court subsequent to the proceeding. Simply stated, one cannot actually litigate what he does not know about.

 We now turn to the central issue in this case, namely, is Ordinance 2139 invalid as spot zoning. A reviewing court when faced with a challenge to a zoning measure must be mindful of certain basic principles. First, a court must presume the zoning ordinance is valid and constitutional and the burden of proving otherwise is on the challenging party. See *Cleaver v. Board of Adjustment*, 414 Pa. 367, 200 A.2d 408 (1964).[11] Moreover,

---

11. In *Cleaver*, the Court stated:
"It may be helpful to add that an Ordinance is presumed to be valid and Constitutional and the burden of proving otherwise is upon one who challenges it: *DiSanto v. Zoning Board of Adjustment*, 410 Pa. 331, 189 A.2d 135; *Phi Lambda Theta Zoning Case*, 400 Pa. 60, 161 A.2d 144; *Schmalz v. Buckingham Twp. Z. B. A.*, 389 Pa. 295, 132 A.2d 233; *Archbishop O'Hara's Appeal*, 389 Pa. 35, 131 A.2d 587, supra; *Whitpain Township v. Bodine*, 372 Pa. 509, 94 A.2d 737. However, zoning regulations must be strictly construed because in derogation of a property owner's Constitutional rights: *Phi Lambda Theta Zoning Case*, 400 Pa. 60, 161 A. 2d 144, supra; *Rolling Green Golf Club Case*, 374 Pa. 450, 97 A. 2d 253; *Medinger's Appeal*, 377 Pa. 217, 104 A.2d 118, supra; *Lord's Appeal*, 368 Pa. 121, 81 A.2d 533, supra; *Lukens v. Ridley Twp. Zoning Board of Adjustment*, 367 Pa. 608, 612, 80 A.2d 765." *Id.* at 373, 200 A.2d at 412.

before a court may declare a zoning ordinance unconstitutional, the challenging party must clearly establish the provisions are arbitrary and unreasonable and have no relation to the public health, safety, morals, and general welfare and if the validity is debatable the legislative judgment is allowed to control. *Bilbar Construction Co. v. Eastown Twp. Zoning Board*, 393 Pa. 62, 141 A.2d 851 (1958).[12]

12. In *Bilbar*, it was aptly noted:

"The rule is well established that the burden of proving clearly and unmistakably the unconstitutionality of a legislative enactment is upon the person so asserting. In *Gottschall v. Campbell*, 234 Pa. 347, 363, 83 A. 286, 292, it was said,—'That one who asks to have a law declared unconstitutional takes upon himself the burden of proving beyond all doubt that it is so, has been so often declared that the principle has become axiomatic.' A legislative enactment can be declared void only when it violates the fundamental law clearly, palpably, plainly and in such manner as to leave no doubt or hesitation in the minds of the court. *Sharpless v. Mayor, etc., of City of Philadelphia*, 21 Pa. 147, 164. In *Erie & North-East Railroad Company v. Casey*, 26 Pa. 287, 300–301, it was recognized that 'The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases; one department of the government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional, takes upon himself the burden of proving, beyond all doubt, that it is so.' *Hadley's Case*, 336 Pa. 100, 104, 6 A.2d 874, 877, succinctly states as the practical effect of the rule, 'All presumptions are in favor of the constitutionality of acts and courts are not to be astute in finding or sustaining objections to them. . . .'

"The heavy burden resting upon the person asserting unconstitutionality of legislation is one of the most firmly established principles of our law: *Loomis v. Philadelphia School District Board of Education*, 376 Pa. 428, 431, 103 A.2d 769; *Flynn v. Horst*, 356 Pa. 20, 31, 51 A.2d 54; *Pennsylvania Company, etc., Trustee, Case*, 345 Pa. 130, 137–138, 27 A.2d 57; *Hadley's Case*, supra; *Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania*, 318 Pa. 401, 405–406, 178 A. 291; *Busser v. Snyder*, 282 Pa. 440, 449, 128 A. 80; *Commonwealth v. Sweeney*, 281 Pa. 550, 556–557, 127 A. 226; *Commonwealth v. Grossman*, 248 Pa. 11, 14, 93 A. 781; *Gottschall v. Campbell*, supra. In particular, where the constitutionality of zoning ordinances has been attacked we have presumed that the municipal legislative body acted with purpose to serve the public welfare and that all intendments are in favor of their action." *Id.* at 70–71, 141 A.2d at 855.

With these basic principles in mind, the Court in *Schubach I* set out perhaps the best all encompassing definition of spot zoning in the following manner: [13]

> "It is well-settled that 'an ordinance cannot create an "island" of more or less restricted use within a district zoned for a different use or uses, where there are no differentiating relevant factors between the "island" and the district . . . . Thus, singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment, is invalid "spot" zoning.' 8 McQuillin, Municipal Corporations, § 25.83, at 224–25 (3d ed. 1965). Accord, e. g., *Mulac Appeal,* 418 Pa. 207, 210 A.2d 275 (1965)."

440 Pa. at 253–54, 270 A.2d at 399.

 Possibly the most important factor in an analysis of a spot zoning question is whether the rezoned land is being treated unjustifiably different from similar surrounding land. In *Mulac Appeal,* 418 Pa. 207, 210 A.2d 275 (1965), this Court said:

> "What is most determinative is whether the parcel in question is being singled out for treatment unjustifiably differing from that of similar surrounding land, thereby creating an 'island' having no relevant differences from its neighbors." *Id.* at 210, 210 A.2d at 277.[14]

**13.** Spot zoning is unconstitutional because it accords one piece of land different treatment from that of the surrounding property: "Where a small parcel of land is classified differently from all the surrounding area for no apparent reason or purpose except to favor the owner it is referred to as 'spot zoning,' and is invalid because it is discriminatory." *Boyle Appeal,* 179 Pa.Super. 318, 327, 116 A.2d 860, 866 (1955).

**14.** However, a reviewing court cannot and should not limit its inquiry to the mere physical aspect and characteristics of the land.

Instantly, the rezoned Tract is distinctly different from the surrounding residential land. This particular piece of property fronts on two heavily traveled traffic arteries which distinguishes it from the surrounding land. There is testimony in the record, accepted by the chancellor, establishing that, because of the land's location directly fronting on Red Lion Road, the Tract is not desirable for detached dwelling residential use. See *Schmidt v. Philadelphia Zoning Board of Adjustment,* 382 Pa. 521, 114 A.2d 902 (1955). Testimony also established the land, because of its location, was not economically feasible to develop as detached residential property. See *Mulac Appeal,* supra.[15] Furthermore, and possibly most important, this piece of property is directly across

As Mr. Justice Roberts aptly pointed out in his concurring opinion in *Mulac Appeal*:

"Indeed, the majority reaffirms this point when it states that the 'amendatory ordinance creates a commercially zoned island in a residentially zoned sea and, *unless a proper basis appears for such special treatment,* cannot be sustained.' [Emphasis in original.] However, by stating that it is unnecessary to discuss or decide the question of comprehensive plan and the promotion of the public health, safety, morals and general welfare, the majority ignores evidence of the very 'proper basis' which it has said would justify special treatment. The majority opinion implies, therefore, that such 'proper basis' can only be found in some distinguishing physical characteristics which sets the land apart from the surrounding area. *Our consideration of a zoning ordinance should not be so confined, however, for the reason that zoning involves many complex factors, the mere 'lay of the land' being only one of them."* [Emphasis supplied.]

418 Pa. at 213–14, 210 A.2d at 278–279.

**15.** In *Mulac Appeal,* the Court noted the lack of economic feasibility of a particular use could distinguish land from surrounding land, stating:

"The facts fail to disclose any sound basis for such special treatment. The record discloses that the property could be used, albeit not as profitably, for residential purposes. The record does not support the conclusion reached by the court below that new residential development in the neighborhood is not economically feasible, the owner himself having testified that the land could be so developed."

*Id.* at 211, 210 A.2d at 277.

Red Lion Road from a previously existing commercial use. Grouping together the fact that this land fronts on a commercial use, and is ill-suited, both economically and location-wise, for detached dwelling residential use, it is only realistic to say that this piece of land, by its very location, is useable only as a "natural extension" of the already existing commercial use.[16] In *Upper Darby Township Appeal*, 413 Pa. 583, 198 A.2d 538 (1964),[17] the Court recognized the importance of a natural extension of a previously existing use and stated:

"The tract, of land here in question, slightly less than an acre in area, was rezoned at the request of appellees' grantor. This fact does not in and of itself invalidate the rezoning. *Donahue v. Zoning Bd. of Adjust.*, Supra. Nor does the limited size of the plot and the fact that all other properties fronting on Marshall Road, with one exception not here pertinent, are zoned B–Business, necessarily force the conclusion that the enactment is invalid. Reference to the township zoning map discloses that the area rezoned is a *natural extension* of an already existing R–3 Residential district, adjoining to the north and west.

. . . . . . . .

"Nor can we brand the ordinance as illegal spot zoning. The area rezoned is not an ' ". . . 'island' of

16. Moreover, a reviewing court cannot take too constrained a view of the surrounding neighborhood. To discuss a zoning measure by merely looking at the nature of the particular city block on which the rezoned land is located, is simply incorrect. Although the court must focus its attention on the immediately surrounding land, and instantly the residential land to the west, since the owners thereof have a distinct right to the protection of their property interests, we are mindful that in this immediate area there is an industrial tract, multi-family apartment structures and shopping areas. If one stood on the Tract and made a 360 degree turn, within a few blocks of the land he would find many different land uses.

17. Not only is the natural extension analysis of importance when considering the physical characteristic of the land, but it is equally important when determining if the rezoning comports with the comprehensive plan for the development of a city.

more or less restricted use within a district zoned for a different use or uses" '. As previously stated herein, the area rezoned is adjoined on the north and west by a large R-3 Residential district and no residential island has been created by the ordinance." [Emphasis supplied.]

*Id.* at 586–87, 198 A.2d at 540. Hence, in no way did the Ordinance create an "island" of substantially different use without proper justification. Rather, because of the location of this land, it is by nature unsuited for detached dwelling use and, therefore, different from the surrounding residential land. Yet, it is well situated for commercial use; in fact it is no more than the natural extension of a previously existing commercial use.

Furthermore, a review of the record establishes the chancellor was warranted in finding the rezoning was in accord with the comprehensive plan for the City of Philadelphia.[18] There was testimony by John Mitkus, who represented the City Planning Commission, that this property was a trouble spot in the area because it was immediately across the street from a primarily commercial and industrial area, and also bordered on a residential area. He testified it would be in accord with the comprehensive plan of the city and would promote the orderly development of the neighborhood to put the Home on this Tract. He stated this piece of property

18. Appellees take too narrow a view of a comprehensive plan. Chief Justice Bell properly described the nature and purpose of such a plan in *Cleaver, supra,* stating:

"A comprehensive plan does not contemplate or require a 'master-plan' which *rigidly* provides for or attempts to answer in minute detail every possible question regarding land utilization or restriction. Neither a zoning ordinance nor a comprehensive plan is absolutely rigid, static and unchangeable; either or both may be amended, supplemented, changed, modified or repealed—in the sound discretion of the legislative body and in accordance with statutory and other pertinent legal and Constitutional requirements—as conditions or changing circumstances may require . . . ." [Emphasis in original.] *Id.* at 414 Pa. 375, 200 A.2d at 413.

was a "transition zone" between the two areas of different land use, and the Home represented the best "buffer" between the two uses. This Court in *Cleaver v. Zoning Board of Adjustment,* supra, recognized the validity of such "transition zones" [19] A court must be mindful of the fact that in rapidly growing cities certain pieces of property will lie between two different uses, and it is in conformity with the comprehensive plan to put this land to the best use possible. This "transition zone" theory, as recognized in *Cleaver,* in no way erodes the rejection of the argument in *Schubach I,* that because this land was on the border line between the two uses it should be rezoned. We in no way retreat from the view that simply because a piece of property rests on the border of a commercial zone it automatically can be rezoned commercial. Instantly, we merely recognized that to promote the orderly development of a community the zoning authorities must be allowed to put a piece of property to the use which is most beneficial to the comprehensive plan, i. e., establish a land use which best blends in with surrounding different uses.

Lastly, the record also supports the chancellor's finding that there exists a need in the particular

19. In *Cleaver,* Mr. Chief Justice Bell recognized the importance of a transition zone to the orderly development of the community:
 "Furthermore, in the general discussion of how population and business should and may be wisely spread throughout the Township, the plan states:
 " '*Apartments are proposed as transitional uses between residential and non-residential areas, in accessible locations.* The appropriateness of a particular location for apartment development will depend upon such criteria as topography, available acreage depth of lot, etc.
 " 'While apartments are a residential use, their locational requirements are quite similar to those for non-residential uses. Apartments, because of their more intensive use of land, require good highway and rapid transit facilities. Because of the relatively low site coverage, particularly for multi-story developments, *apartments can be designed so as to be compatible with both adjoining residential and non-residential uses.*' " [Emphasis in original.]
 *Id.* 414 Pa. at 378, 200 A.2d at 415.

community [20] for such a facility, hence, the Home does have a substantial relation to the public health, safety, morals and general welfare of the particular community.[21] See *Salvitti v. Zoning Board of Adjustment,* supra.

In sum, we rule that Ordinance 2139 is constitutional and does not constitute "spot zoning". We further rule that neither the doctrines of res judicata nor of collateral estoppel are applicable instantly.

Therefore, the Order of the Commonwealth Court is reversed. Each party is directed to pay own costs.

JONES, C. J., and ROBERTS, J., concur in the result.

**20.** The particular community would, at the very least, be Northeast Philadelphia. This is the land area the chancellor employed. A court cannot take too narrow a view of a community, otherwise this element could be used as a weapon to keep out certain types of structures; hence, it could improperly be used as a tool to promote exclusionary zoning, contrary to the rulings of this Court in *Concord Township Appeal,* 439 Pa. 466, 268 A.2d 765 (1970), and *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970).

**21.** The chancellor stated:

"In addition to the foregoing testimony of Mr. Mitkus that the interests of surrounding property owners would be protected by the proper development of this transitional area, the record shows a disparate need for such facilities in developed areas of the Northeast. Mrs. Edith Taylor, Executive Director of the Pennsylvania Association for Retarded Children (PARC), also called by defendants, testified that the current trend is to locate nursing home facilities for physically and mentally retarded children in areas where normal persons work and live and the daily activities of a community environment are present. Mrs. Taylor also testified that large isolated institutions are no longer desirable because parental access to urban nursing homes results in more frequent visits which are beneficial to these unfortunate young patients. Another witness for defendants, Mr. Manuel Kaufman, First Deputy Commissioner of Philadelphia Department of Welfare, concurred with Mrs. Taylor that urban location of facilities for the severely retarded best serves the welfare of the handicapped individual and their families, and further pointed out that in the Northeast area, where more than 10% of the city's population resides, no such facilities are provided for that particular community."