David LaLeike and Brendan Dolan, Appellants
v.
West Chester Borough and West Chester University of Pennsylvania
No. 271 C.D. 2009.
Commonwealth Court of Pennsylvania.
Argued: November 9, 2009.
Filed: January 7, 2010.
BEFORE: JUBELIRER, Judge; FRIEDMAN, Senior Judge; FLAHERTY, Senior Judge.

OPINION NOT REPORTED
MEMORANDUM OPINION BY SENIOR JUDGE FRIEDMAN
David LaLeike and Brendan Dolan (Appellants) appeal from the January 20, 2009, order of the Chester County Court of Common Pleas (trial court), which affirmed the decision of the Borough Council of West Chester (Borough Council) to approve a preliminary land development application filed by West Chester Borough (Borough) for construction of a multi-story parking garage containing over 400 parking spaces.[1] We affirm.
On June 28, 2006, the Borough and West Chester University of Pennsylvania (University) entered into a Memorandum of Understanding (MOU) for a proposed parking structure to be located at the existing "F-lot" on New Street near the intersection of Nields Street in the Borough. F-lot, a ground-level lot, is located on a 1.85-acre parcel of real property owned by the University and has 180 parking spaces. The MOU specifically stated that, "based on the Comprehensive Campus Facilities Plan completed by the University, the University has an immediate need for additional campus parking for its students to meet its current and projected parking needs[.]" (R.R. at 9a). The MOU also provides for parking spaces unaccounted for in the agreement to be credited against the University's future requirements, such as a student recreation center and a new housing facility. Pursuant to the MOU, the University would lease the land to the Borough, and the Borough would build and manage the parking structure in accordance with a separate license for use of real property. The Borough also was required to obtain all necessary land development approvals, construct and maintain the garage, make tax payments, pay the University the net revenue received and finance the construction costs through the issuance of tax-exempt bonds. For its part, the University was required to make all debt service payments and pay the Borough a monthly management fee of 1.5% of the actual construction cost. This management fee would be consistent with the fee for the current garages that are operated throughout the Borough. The Borough would own the parking structure once it was completed and operational, but, upon termination of the thirty-year license, ownership of the parking structure would revert to the University, unless the University chose otherwise.
On April 10, 2007, the Borough submitted an application for preliminary land development plan approval to construct the parking garage. F-lot is located in the Borough's Neighborhood Conservation (NC-1) District. The residents of that low-density district were vehemently opposed to the plan and made their feelings known to both the Borough Planning Commission and Borough Council. The Borough Planning Commission voted unanimously to recommend denial of the preliminary development plan, believing it did not involve a municipal use, which is permitted by right in a NC-1 district. On November 21, 2007, Borough Council denied the application, without determining whether the garage was a municipal use. Thereafter, counsel for the University wrote to the Borough, informing it that it had intentionally breached its obligations under the MOU and demanding immediate reimbursement of all costs and expenses the University incurred in reliance on the MOU. On the advice of the Borough Solicitor, Borough Council voted to approve resubmission of the application, and, after the Borough resubmitted the application, the Borough Planning Commission recommended approval. Borough Council finally approved the application on May 21, 2008.
Appellants appealed Borough Council's decision to the trial court.[2] On January 20, 2009, the trial court, which took no additional evidence, affirmed the Borough Council's decision. Appellants then filed a notice of appeal with this court.
On appeal,[3] Appellants first argue that the proposed parking structure is not permitted within the NC-1 District as a "municipal use" pursuant to the Borough's zoning ordinance (Ordinance) because the garage will be built according to the University's Comprehensive Campus Facilities Plan, on ground owned by the University and primarily for the University's use.
"Municipal use" is defined in the Ordinance as:
A use conducted by the Borough, such as parks, playgrounds and other recreational, cultural and conservation areas; the sites for sewage treatment, solid waste and refuse disposal and other public facilities operated for the good and well-being of the Borough; and activities regularly conducted by the Borough at such sites and/or facilities.
(Ordinance §112-7.)
Appellants argue that the proposed parking garage clearly is not a public facility operated for the good and well-being of the Borough. Instead, Appellants contend, it will be operated principally for the benefit of a single user, viz., the University. Appellants point out that the MOU does not refer to the Borough's Comprehensive Plan, the Borough's Growth Management Plan or the West Chester Open Space, Recreation, and Environmental Resources Plan, but makes perfectly clear that the University presently needs the parking structure for its students. Appellants further argue that the University's needs are not the needs of the general public because no parking problem exists in the neighboring residential area, and, in any event, the parking garage would be available to the public in only a de minimis manner. Appellants also point to two other garages constructed pursuant to agreements between the University and the Borough, contending that, in one case, a zoning decision restricts use of the garage to University students and staff, and that, in the other, predominant use of the garage is restricted to University permit parking.
Appellants also assert that the trial court misapplied relevant case law, specifically, Price v. Philadelphia Parking Authority, 422 Pa. 317, 221 A.2d 138 (1966), Cellco Partnership v. North Annville Township Zoning Hearing Board, 939 A.2d 430 (Pa. Cmwlth. 2007), appeal denied, 600 Pa. 736, 963 A.2d 472 (2009), and Campbell v. Bethlehem Parking Authority, 342 A.2d 114 (Pa. Cmwlth. 1975), to support its determination that the proposed structure is permissible under the Ordinance because the University is not the exclusive user of the garage. Appellants assert that, instead of considering the issue of exclusive use, the trial court should have considered whether the "totality of the private benefit"[4] impermissibly accrues to the University.
None of these cases are precisely on point. In Price, in holding that the parking authority exceeded its powers by entering into a sale and leaseback agreement with a private developer for construction of a public parking facility, the Pennsylvania Supreme Court looked askance at what it dubbed "substantial public financing of a private endeavor." Price, 422 Pa. at 335, 221 A.2d at 148. The court also stated that "the totality of the private benefit accruing to [the private developer] must be considered in determining whether the project as proposed reflects the required predominant public benefit." Id. at 336, 221 A.2d at 149 (footnote omitted). Here, however, the University is a Commonwealth agency, not a private developer. Thus, the rationale set forth in Price is not applicable here.
Cellco involved Verizon's proposed construction of a monopole cell phone tower, which Verizon argued was similar to a municipal structure and therefore permitted in a rural-residential (R-1) district. In affirming the trial court's order upholding the zoning hearing board's decision denying Verizon's request to locate this tower in the R-1 district, we explained that a municipal structure is owned or operated by a municipality, not a for-profit enterprise like Verizon. We further explained that, in the case of a municipal or utility structure, a governmental body rather than a private entity decides if there is a public benefit advanced by the structure, and no public body ever found a public benefit to be furthered by Verizon's proposed tower. Appellants argue that, like Verizon in Cellco, the University, not the Borough, found a public benefit by construction of the parking garage on F-lot. However, it was Borough Council, not the University, that voted to approve the resubmitted plan application. Moreover, unlike Verizon, the University is not a private business entity.
In Campbell, the owner of a shopping mall sued to enjoin the parking authority's proposed construction of a parking garage in the central business district of the City of Bethlehem because he believed that the parking garage would predominantly serve the parking needs of two private interests. Distinguishing Price, we affirmed the trial court's conclusion that the garage was intended for a public purpose on the theory that the garage was predominantly a public use, and any private gain would be merely incidental. Of course, no private interest is involved in this case. Moreover, here, as in Campbell, the parking garage will accommodate a specific public need because parking would be open to the general public.[5]
The fact that the parking garage is being built to serve the University's needs does not preclude its operation from benefitting Borough citizens. While Appellants themselves may not directly face parking issues, the Borough has other residents and community members, including University students, staff and visitors, to consider. Further, Appellants' comparison of this proposed garage to two other garages constructed pursuant to cooperative agreements between the University and the Borough is unavailing. Even if one of those garages is limited to University-related use and the other is predominantly used by University staff and students with permit parking, there is no indication that these garages do not provide an overall public benefit, or that the garage proposed here will not do so.
Appellants next argue that Borough Council's decision constitutes illegal contract zoning or special legislation and is, therefore, ultra vires. Appellants assert that, if the resubmitted application was not contract zoning, the University would not have threatened the Borough with a lawsuit for breach of contract when the original plan application was denied. However, the MOU specifically provides that
[t]he Borough will be responsible for compliance with all applicable zoning codes, building codes and any applicable federal, state or local laws, statutes, ordinances, rules or regulations. It is the responsibility of the Borough to research all zoning requirements, and zoning variances which may be required in order to construct the Project. In addition, the Borough will be responsible for obtaining all required land development approvals.
(R.R. at 11a). Nothing in the MOU suggests the parties here were attempting to zone by contract; rather, the MOU provides that the Borough is to comply with applicable zoning codes, perform required research, and seek all relevant land development approvals. Here, Appellants admit that, if permitted as a municipal use, the proposed garage conforms to all bulk and area requirements of the Ordinance. (Appellants' brief at 7.) Further, there were no legislative or zoning changes occasioned by the circumstances herein. Municipal uses have been permitted principal uses by right in a NC-1 district since 1988, and F-lot has been included in the NC-1 district since 1988. F-lot has also historically been used as a parking lot since 1967. Therefore, contrary to Appellant's further argument, this is not a case involving differential treatment unjustified by consideration of health, safety, morals or general welfare of the community. Warner Company v. Zoning Hearing Board of Tredyffrin Township, 612 A.2d 578 (Pa. Cmwlth. 1992), appeal denied, 533 Pa. 654, 624 A.2d 112 (1993).[6]
Finally, Appellants argue that the Borough Council's decision to approve the resubmitted application is precluded by the doctrine of res judicata. According to Appellants, the Borough should have appealed the November 21, 2007, adverse decision of the Borough Council rather than choosing to resubmit a second, identical application. In support of their argument, Appellants assert that, while the Borough and the University cite changes to the second plan, they are being disingenuous because: (1) the resubmitted application is for the same 452-parking-space garage that was denied on November 21, 2007; (2) any correction in the stated number of parking spaces contained in F-lot is irrelevant; (3) the plans submitted with both the first and second applications show the same point of "special egress" onto Nields Street; and (4) the height of the proposed garage has not changed from the first to the second application.
Res judicata prevents a court from entertaining a second, identical application where all of the following apply: (1) identity of the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity of the quality in the persons for or against whom the claim is made. Dubois Dutch, LLC v. Sandy Township Board of Supervisors, 940 A.2d 576 (Pa. Cmwlth. 2007), appeal denied, 598 Pa. 752, 954 A.2d 578 (2008).
There is no question that the first and second applications for preliminary land development plan approval are substantially similar. Even so, a review of the record reveals that the applications are not identical.[7] Appellants acknowledge that Council agreed to reconsider its decision within the applicable appeal period. More important, although Appellants assert that Borough Council made findings that the proposed garage was not a municipal use, the November 21, 2007, Borough Council meeting minutes containing its oral vote do not reflect any discrete finding by Council on this issue, and we have been directed to no written findings in this regard.[8] Therefore, we agree with the trial court that the doctrine of res judicata "should not be applied here where the governing body never reached the merits of the application in its first vote." (Trial ct. op. at 14.)
The law is well settled that res judicata is to be used sparingly in zoning matters. Schubach v. Silver, 461 Pa. 366, 336 A.2d 328 (1975). We believe that application of that doctrine is particularly apt here. For all of the above reasons, we now affirm.

ORDER
AND NOW, this 7th day of January, 2010, the January 20, 2009, order of the Court of Common Pleas of Chester County is hereby affirmed.
NOTES
[1] Appellants are residents living in close proximity to the property at issue.
[2] The University subsequently filed a Notice of Intervention.
[3] In a land use appeal where the trial court takes no additional evidence, this court's review is limited to deciding whether the governing body committed an abuse of discretion or an error of law. Morris v. South Coventry Township Board of Supervisors, 836 A.2d 1015 (Pa. Cmwlth. 2003), appeal denied, 580 Pa. 701, 860 A.2d 126 (2004). A conclusion that the governing body abused its discretion may be reached only if substantial evidence does not support its findings. Id.
[4] Price, 422 Pa. at 336, 221 A.2d at 149.
[5] See, e.g., the testimony of Steven Crew, architect of the proposed garage, who explained how the automation would work, whether one purchased a ticket to the garage or bought a pass from the Borough. (R.R. at 122a.) See also the statement of Kristin Camp, Borough Solicitor, to the Planning Commission that "any member of the public can utilize the parking facility." (R.R. at 117a.)
[6] Cf. Knight v. Lynn Township Zoning Hearing Board, 568 A.2d 1372 (Pa. Cmwlth. 1990) (determining that property owners' agreement with the Lynn Township Supervisors that, upon enactment of a zoning ordinance rezoning certain land, property owners would record a covenant running with the land which restricted construction to single-family homes with a value of not less than $70,000, constituted illegal spot zoning).
[7] The first application, in its final form, sought 452 parking spaces, the same number initially proposed in the second application; however, the first application originally contained an apparently erroneous request for 435 spaces, when 497 were actually being sought. As well, the second application clarified that F-lot has 180 existing parking spaces, rather than the 154 specified in the first application. The second application also specified "proposed limited use special egress" onto Nields Street in contrast to the "proposed access" onto Nields Street more generally contained in the first application. In addition, the second application clarified that the proposed building height was 33 feet, 8 inches versus the proposed building height of "less than 45" feet represented in the original application. Architect Steven Crew further testified at the February 26, 2008, meeting before the Borough Planning Commission that the average height of the proposed garage had been reduced to 27 feet. (R.R. 112a-113a).
[8] Even so, there has been no issue raised here of a deemed decision.